<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                        :
RICHARD MOLLOY,                         :
                                        :
            Plaintiff,                  :
                                        :          Civil Action No. 08-4801 (JAG)
       v.                               :
                                        :              **OPINION**
MICHAEL J. ASTRUE,                      :
Commissioner of Social Security,        :
                                        :
            Defendant.                  :
_____:


<u>**GREENAWAY, JR., U.S.D.J.**</u>

       This matter comes before this Court on appeal, by plaintiff, Richard M. Molloy

("Plaintiff" or "Molloy") of the Social Security Commissioner's (the "Commissioner") decision

to deny his Supplemental Security Income ("SSI") application[1] and to dismiss, without a hearing,

his Disability Insurance Benefits ("DIB") application.[2]

       Molloy asserts that the Commissioner's decision to deny his SSI application is not

supported by substantial evidence.  Further, he states that the notice of hearing was

constitutionally inadequate.  Molloy alleges, regarding his DIB application, that due process

_____

       [1]  Supplemental Security Income is a national program under the Social Security Act (the
"Act") that provides supplemental security income to individuals who have attained age 65, or
are blind or disabled.  42 U.S.C. § 1381 *et seq.*

       [2]  Disability insurance benefits is a program under the Act through which benefits are
provided when claimant with a sufficient number of quarters of insured employment has suffered
such a mental or physical impairment that the claimant cannot perform substantial gainful
employment for at least twelve months.  42 U.S.C. § 423 *et seq.*

violations occurred and that the administrative law judge ("ALJ") incorrectly applied the principle of res judicata.  Molloy also asserts that the Commissioner failed to rule on his request to reopen an earlier DIB claim.  For reasons set forth below, this Court finds the Commissioner's decision is supported by substantial evidence and did not violate Molloy's constitutional rights; however, the Commissioner failed to rule on Molloy's request to reopen his 2004 DIB claim. Therefore, the Commissioner's decision shall be affirmed and Molloy's request to reopen shall be remanded to the Commissioner for a determination of the issue to reopen.

## I.  PROCEDURAL HISTORY

On February 4, 2004, Molloy filed applications for DIB (Tr.[3] 136-38) and SSI (Tr. 139-41).  Subsequently, Molloy's applications were denied at both the initial (Tr. 82-86, 87-91) and reconsideration stages (Tr. 97-99, 100-03).

On December 2, 2005, Molloy filed new DIB (Tr. 142-45) and SSI applications (Tr. 146-50).  Molloy alleged the same onset date as he did in the 2004 applications—September 18, 2001.  (Tr. 142-45, 146-50.)  Both claims were denied at the initial level.  The DIB claim was denied December 11, 2005, on res judicata grounds, stating, "[y]ou do not qualify for benefits because this application concerns the same issues which were decided when an earlier claim was denied.  We do not have any information which would cause us to change our earlier decision." (Tr. 104.)  The SSI claim was denied on March 3, 2006, after a finding that Molloy was disabled due to Hepatitis C and depression, but that his condition did not prevent him from working. Specifically, the Commissioner held that the lab tests indicated that he could work if he followed

---

[3]  The Act instructs the Commissioner to file, as part of the answer, a certified copy of the transcript of the record, including any evidence used to formulate the conclusion or decision.  42 U.S.C. § 405(g).  "Tr." refers to said transcript.

treatment for his liver disease and that his depression affected some of his abilities but he could still do simple jobs.  (Tr. 107-11.)

Molloy secured legal representation on April 28, 2006.  (Tr. 113.)  On that day, he and his counsel filed a request for reconsideration on his SSI claim, but not for his DIB claim.  (Tr. 112.) After the Commissioner denied the SSI claim on reconsideration in June of 2006 (Tr. 81), Molloy requested a hearing (Tr. 114).  On December 21, 2006, he appeared for a hearing before Administrative Law Judge Dennis O'Leary ("ALJ O'Leary").  (Tr. 40-74.)  At the hearing, Molloy's counsel requested that ALJ O'Leary reopen the prior (2004) DIB claim.  (Tr. 45, 46.)

On January 16, 2007, ALJ O'Leary issued his decision dismissing a request for a hearing on Molloy's 2005 DIB claim, based on res judicata,[4] and denying Molloy's SSI claim after finding that he was not disabled, within the meaning of the Act, during the period alleged.  (Tr. 17-38.)  ALJ O'Leary failed to explicitly rule on the reopening issue, either at the hearing or in his written decision.  (See Tr. 17-74.)

--------

[4]  At the hearing, there was some confusion about the procedural posture of Molloy's 2005 DIB application and whether the claim was in fact appealed.  This issue is discussed infra. In the jurisdictional section of his decision, ALJ O'Leary wrote:

> It is noted that the claimant has filed a previous application for disability and disability insurance benefits and supplemental security income on February 4, 2004, alleging the same disability onset date of September 18, 2001.  These claims were denied initially on May 4, 2004, and upon reconsideration on November 24, 2004.  I note that the claimant's DIB claims were denied at the initial and reconsideration levels due to lack of medical evidence prior to his date last insured (June 30, 2003).  No further appeal was pursued with respect to this determination.  Therefore, with regards to the DIB claim filed on November 29, 2005 [sic], the issue of the claimant's disability is identical in the former and current claims and was previously decided, the doctrine of res judicata bars consideration of this issue through the date of prior determination.  Accordingly, the DIB request for hearing is dismissed for the period from the alleged onset date of September 18, 2001 through November 24, 2004 in accordance with 20 [C.F.R.] § 404.957(c)(1).

(Tr. 17.)

On July 30, 2008, the Appeals Council denied Molloy's request for review of ALJ

O'Leary's decision.  (Tr. 6-8.)  Molloy appealed the Commissioner's decision by filing a

complaint with this Court on September 24, 2008. (Docket Entry No. 1.)

## II.  JURISDICTION

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction over "any final decision of the

[Commissioner] made after a hearing."[5]  When the Appeals Council denied review of ALJ

O'Leary's decision, his decision to deny Molloy's SSI claim became the final decision of the

Commissioner.  Accordingly, this Court has jurisdiction over Molloy's SSI appeal.

However, ALJ O'Leary's decisions about Molloy's DIB claims, namely, not to rule on his

(Molloy's) request to reopen his 2004 claim and to apply res judicata to his 2005 claim, raise, in

the first instance, jurisdictional questions for this Court.  Generally, "federal courts lack

jurisdiction . . . to review the Commissioner's discretionary decision to decline to reopen a prior

application or to deny a subsequent application on *res judicata* grounds," because they are not

"final decisions . . . made after a hearing."  Tobak v. Apfel, 195 F.3d 183, 187 (3d Cir. 1999).[6]

While courts cannot review a decision to apply res judicata, they retain jurisdiction to determine

whether res judicata was properly applied.  See id. (noting the "undisputed proposition that

---

[5]  Section 405(g) states: Any individual, after any final decision of the Commissioner
made after a hearing to which he was a party, irrespective of the amount in controversy, may
obtain a review of such decision by a civil action commenced within sixty days after the mailing
to him of notice of such decision or within such further time as the Commissioner may allow.
Such action shall be brought in the district court of the United States for the judicial district in
which the plaintiff resides, or has his principal place of business, or if he does not reside or have
his principal place of business within any such judicial district, in the United States District
Court for the District of Columbia. . . . The court shall have power to enter, upon the pleadings
and transcript of the record, a judgment affirming, modifying, or reversing the decision of the
Commissioner**,** with or without remanding the cause for a rehearing. . . ." 42 U.S.C. § 405(g).

[6]  Jurisdiction does exist where a colorable constitutional issue is presented.  Califano v.
Sanders, 430 U.S. 99, 107-09 (1977).

4

federal courts also have jurisdiction to determine whether *res judicata* has been properly applied"); Rogerson v. Sec'y of Health and Human Servs., 872 F.2d 24, 29 (3d Cir. 1989) (reviewing entire record to determine if res judicata was properly applied).

This Court finds that these precedents do not preclude jurisdiction over Molloy's argument regarding his reopening request. Molloy does not seek review of a discretionary decision; he argues only that ALJ O'Leary failed to make a decision at all.

The application of res judicata to Molloy's 2005 DIB claim presents a more complex jurisdictional question. Though this Court has jurisdiction to determine whether res judicata was properly applied, Molloy had never requested a hearing on his 2005 DIB claim—therefore, although ALJ O'Leary decided to dismiss a request for a hearing on the 2005 DIB claim, there was in fact no such request properly before him.[7] As a result of this unique procedural error, this Court must first determine a threshold question: does this Court have jurisdiction over a decision rendered by ALJ O'Leary, and affirmed by the Appeals Council, on a matter that had not been appealed?[8] This question turns on the determination of whether such a decision is "final."

---

[7] As noted above, Molloy filed DIB and SSI claims in 2005 (after having already filed and received initial denials and reconsideration denials on claims filed in 2004). Both claims were denied at the initial level, and afterward, Molloy, with the assistance of counsel, filed for reconsideration of only his SSI claim. After the SSI claim was denied on reconsideration, Molloy and his counsel requested a hearing on, once again, only his SSI claim. At the hearing, Molloy's counsel stated that he believed both the DIB and SSI claims were pending before ALJ O'Leary. (Tr. 44-46.) Having then believed, incorrectly, that both claims were before him, ALJ O'Leary issued a decision dismissing a request for a hearing on DIB and denying SSI on the merits.

[8] Neither party has addressed this issue directly. Molloy does not acknowledge the fact that the DIB claim had not been appealed beyond the initial denial. Although Molloy presents an argument that his mental illness precluded him from understanding his appellate rights (Pl.'s Br. 13-15), this argument addresses his failure to pursue his 2004 DIB claim beyond the reconsideration level. See 20 C.F.R. § 404.911(a) (good cause for missing deadline to review includes mental limitations that prevented claimant from timely appealing). This argument does not address, and could not account for, his failure to file for reconsideration on his 2005 DIB

5

Because the Commissioner's actions in this case may be interpreted as constituting waiver of the requirement for exhaustion of administrative remedies, this Court finds that the decision to apply res judicata is final and that jurisdiction exists to determine whether res judicata was correctly applied.

The circumstances constituting a waiver of exhaustion requirements have been established by Supreme Court precedents.  The Court identified that § 405(g) sets forth three prerequisites to a district court's jurisdiction; the one that is "central to the requisite grant of subject-matter jurisdiction" is that there be a final decision after a hearing.[9]  Weinberger v. Salfi, 422 U.S. 749, 764 (1975).  This requirement itself, the Court held, "consists of two elements, only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived' by the [Commissioner] in a particular case."  Mathews v. Eldridge, 424 U.S. 319, 328 (1976).  "The non-waivable element is the requirement that a claim for benefits shall have been presented" to the Commissioner, and "the waivable element is the requirement that the administrative remedies prescribed by the [Commissioner] be exhausted."  Id.

Molloy has satisfied the non-waivable requirement by presenting his claim for benefits to the Commissioner.  He has presented both his claim for DIB, by filing in 2005, and also his specific argument that res judicata should not have been applied (Tr. 532 (letter to Appeals

claim, when he was represented by counsel.

The Commissioner has made note in his brief of the fact that the DIB claim was not properly before ALJ O'Leary; however, the Commissioner does not make any legal arguments with respect to the issue.  (See, e.g., Def.'s Br. Pursuant to L. Civ. R. 9.1 [hereinafter "Def.'s Br."] at 6 ("As an initial matter, the ALJ did not have a request for a hearing before him . . . . In any event, the ALJ decided . . . .").)

[9]  The other requirements are a statute of limitations (that civil action be commenced within 60 days of notice of the Commissioner's final decision) and appropriate venue (that the action be filed in the appropriate district court).  Salfi, 422 U.S. at 763-64; 42 U.S.C. § 405(g).

Council challenging ALJ O'Leary's decision for, inter alia, the incorrect application of res judicata when there was new and material evidence presented)).

The waivable element, exhaustion, is intended to serve certain underlying policy justifications. These include "preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." Salfi, 422 U.S. at 765. The Supreme Court held in Salfi that these purposes have been served, and further exhaustion would be futile, when the Secretary[10] satisfies himself that his determination is final. Id. at 765-66. With this in mind, the Salfi Court interpreted the Secretary's failure to challenge the exhaustion requirements as a determination by him that the decision made at the reconsideration level was final for the purposes of litigation. Id. at 767.

In Rankin, the Third Circuit considered a situation exceedingly similar to Molloy's. Rankin v. Heckler, 761 F.2d 936 (3d Cir. 1985). The Social Security Administration ("Administration") had determined that Rankin's disability had ended and that his eligibility for benefits had ceased. Id. at 938. Rankin appealed that determination, and the appeal was denied. Id. The Administration permitted Rankin to appeal further by filing a request for a hearing, but Rankin did not make such a request within the 60 days he was allotted to do so. Id. at 939.

More than eight months later, the Administration notified Rankin that he did not qualify for a waiver of overpayment of benefits and thus owed the Administration over $15,000. Id. Rankin then obtained a lawyer, and filed an appeal seeking to resolve *both* the disability

---

[10] Pub. L. No. 103-296, § 107(a)(1), 108 Stat. 1464 (1994) substituted "Commissioner of Social Security" for "Secretary of Health and Human Services."

cessation and overpayment waiver issues.  Id.  The Administration held that the disability cessation appeal was untimely and thus not an issue, and affirmed the denial of the overpayment waiver.  Id.  Rankin then requested and obtained a hearing before an administrative law judge. Id.  The administrative law judge noted in his decision that Rankin had not timely appealed the cessation issue, and, then, nonetheless, found that the disability cessation determination was correct.  Id.  The Appeals Council denied Rankin's request to review the decision and the district court subsequently assumed jurisdiction over both issues.  Id.

The Third Circuit held that the cessation issue was properly before the district court although the claimant had not timely appealed.  Id. at 940.  The Circuit court stated, "[a]lthough the plaintiff failed to appeal . . . we find that later events in this case establish the equivalence of full compliance with the § 405(g) requirement," because "the plaintiff obtained the equivalent amount of review . . . that he would have had if he had timely appealed the decision."  Id. at 941. As a result, the Court of Appeals found the underlying policy rationales were satisfied and the Secretary's decision on the disability cessation issue was "final."  Furthermore, the court found waiver because the Secretary had admitted to the allegations in Rankin's complaint, which asserted full exhaustion, and had briefed the merits of the issue without raising exhaustion.  Id.[11]

Here, the Commissioner reviewed the application of res judicata on Molloy's DIB claim at all levels other than at the intermediate reconsideration level.  The policies generally served by

---

[11]   See also Mathews v. Diaz, 426 U.S. 67, 76-77 (1976) (holding that although Secretary moved to dismiss for failure to exhaust, his stipulation at the hearing on the motion that there were no facts in dispute, the case was ripe for summary judgment, and that only the constitutionality of the statute was an issue "was tantamount to a decision denying the application and as a waiver of the exhaustion requirements"); Heckler v. Day, 467 U.S. 104, 110 n.14 (1984) (finding district court had jurisdiction because Secretary's failure to challenge respondents' efforts to exhaust administrative remedies is interpreted as waiver).

the exhaustion requirement have been served here and Molloy has received the ultimate level of administrative review on this issue.  Additionally, the Commissioner failed to even mention the issue of exhaustion during the administrative process.  Even now, before this Court, the Commissioner makes note that Molloy had not appealed his DIB claim, but proceeds to brief the merits of the res judicata issue instead of posing the issue of exhaustion as a jurisdictional bar. (See Def.'s Br. 6 ("As an initial matter, the ALJ did not have a request for a hearing before him . . . . In any event, the ALJ decided . . . ."), 11-13 (arguing new evidence was not material and therefore res judicata was properly applied).)  It is appropriate to interpret the Commissioner's decision to apply res judicata as a final decision.

Therefore, this Court has subject matter jurisdiction over the Commissioner's decisions regarding Molloy's DIB claim, as well as his SSI claim.

### III. LEGAL STANDARDS

A.      **Standard of Review**

This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  It is "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  That is, a court is not "empowered to weigh the

9

evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1973). Additionally, remand is not required where substantial evidence exists on the record supporting the Commissioner's findings and his error would not affect the outcome of the case on remand. See, e.g., Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (finding remand was not required because consideration of claimant's obesity would not affect outcome of case).

**B.    Statutory Standards**

To qualify for benefits, a claimant must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381a.  The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A).  While subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. §§ 404.1520, 416.920.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[12]  20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not gainfully employed, the

---

[12] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

10

Commissioner must determine, at step two, whether the claimant suffers from a severe

impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment is severe if it "significantly

limits [a claimant's] physical or mental ability to do basic work activities."  Id.  If a severe

impairment exists, the Commissioner moves to step three, to compare the medical evidence of

the claimant's impairment or combination of impairments[13] with the impairments that are

presumed severe enough to preclude any gainful work, listed in 20 C.F.R. pt. 404, subpt. P, app.

1 [hereinafter "Listings"].  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's

impairment(s) does not equal an impairment on the list, the claimant's application proceeds to

steps four and five.

At step four, a determination must be made as to whether the claimant retains the residual

functional capacity ("RFC") to perform his "past relevant work."  20 C.F.R. §§ 404.1520(e)-(f),

416.920(e)-(f).  If the claimant is able to perform his past relevant work, he will not be found

disabled under the Act.  In Burnett, the Third Circuit set forth the substeps of a step four analysis:

> In step four, the ALJ must determine whether a claimant's residual functional
> capacity enables her to perform her past relevant work. This step involves three
> substeps: (1) the ALJ must make specific findings of fact as to the claimant's
> residual functional capacity; (2) the ALJ must make findings of the physical and
> mental demands of the claimant's past relevant work; and (3) the ALJ must
> compare the residual functional capacity to the past relevant work to determine
> whether claimant has the level of capability needed to perform the past relevant
> work.

---

[13] Pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the cumulative
effect of the claimant's impairments in determining whether she is capable of performing work
and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  "[T]he combined
impact of the impairments will be considered throughout the disability determination process."
42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 404.1523.  However, the burden still remains on the
Plaintiff to prove, in steps one through four, that the impairments in combination are severe
enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir.
2004) (placing responsibility on the claimant to show how a combination-effects analysis would
have resulted in a qualifying disability).

Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 (3d Cir. 2000).  If the claimant is unable to resume his past work, the disability evaluation proceeds to the fifth and final step.  At this step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. §§ 404.1520(g), 416.920(g).

The Third Circuit has also established procedural requirements for decisions made pursuant to this five-step process.  In Burnett, the Third Circuit found that to deny a claim at step three, the administrative law judge must specify which of the impairments in the Listings apply and give reasons why those listings are not met or equaled.  Burnett, 220 F.3d at 119-20, 120 n.2. In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  (Id.) Subsequent cases have established that this procedural requirement applies to the analysis undertaken at each step.  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).

When medical evidence is inconsistent, the Commissioner must weigh all the evidence to reach a conclusion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Generally, more weight is given to the opinion of a treating physician; "controlling weight" is accorded when such an opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  When a treating physician's opinion is not "well supported," the length and frequency of treatment is considered. The more frequently examined and closely followed a claimant has been, the greater weight his attending doctor's opinion will carry. The more evidence produced in support of a medical opinion and consistency with the entire record, generally the greater the weight it will receive regardless of whether the physician is a specialist. 20 C.F.R §§ 404.1527(d)(3)-(5), 416.927(d)(3)-(5).  Opinions are also accorded more weight when they are supported by medical signs, laboratory findings, and explanations.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

### III. STATEMENT OF FACTS

Richard Molloy is a 55-year-old man with complaints of depression, anxiety, liver disease (Hepatitis C), and back and leg pain.  (Tr. 44, 46-47.)  He has a high school education (Tr. 50) and his work history includes managerial, clerical, and sales positions (Tr. 172).

**A.**   **ALJ O'Leary's Findings**

ALJ O'Leary made the following findings regarding Molloy's SSI application:

1.   The claimant met the insured status requirements of the Social Security Act through June 30, 2003.

2.   The claimant has not engaged in substantial gainful activity since September 18, 2001, the alleged onset date.

3.   The claimant has the following severe combination of impairments: Hepatitis C; degenerative disc disease of the lumbar spine; depression and anxiety; and a history of polysubstance abuse in questionable remission.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the

claimant has the residual functional capacity to perform simple light work activity.

6.      The claimant is capable of performing past relevant work as a clerical worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

(Tr. 20-37.)  ALJ O'Leary concluded his analysis after step four, finding that Molloy was not disabled, within the meaning of the Act, as of September 18, 2001.  (Tr. 38.)

**B.      Medical Evidence**

**1. Dr. Robert Boyajian**

Dr. Robert Boyajian is Molloy's treating physician.  The earliest medical evidence in the record is Dr. Boyajian's progress notes between April and August of 2000.  (Tr. 465-76.)  On April 24, 2000, Molloy complained of stress on the job, and that he had been sexually harrassed by a co-worker.  (Tr. 476.)  He reported that he smoked three packs of cigarettes a day and drank six cans of beer per day.  (Id.)  Dr. Boyajian assessed Molloy with anxiety, tobacco abuse, and chronic cough.  (Id.)  In May, Molloy reported that he was doing well on the medication Dr. Boyajian had prescribed.  (Tr. 471-75.)  Dr. Boyajian also noted that his physical examinations were unremarkable.  (Id.)  By July, Molloy reported feeling less depressed and anxious but Dr. Boyajian gave him a note to keep him out of work due to stress from a hostile work environment. (Tr. 467-68.)  In August, Dr. Boyajian found that Molloy was less depressed and could return to work.  (Tr. 466.)  Dr. Boyajian instructed Molloy to have bloodwork completed and return for a follow-up in September; however, Molloy did not return to the doctor's office until February 2004.  (Tr. 465.)

In January of 2004, Molloy went to the emergency room at Meadowlands Hospital Medical Center, complaining of wrist, hip, and neck pain due to a fall on the ice.  (Tr. 265.)  He

14

had a superficial abrasion on his right hand and decreased range of motion in his right wrist, but the remainder of his examination was negative, including the X-rays of his cervical spine. (Tr. 261-71.)

In February of 2004, Molloy saw Dr. Boyajian and complained that he had been depressed for the past six months and unable to work. (Tr. 462.) In March, Dr. Boyajian sent Molloy for bloodwork and an EKG after Molloy complained of chest pain (Tr. 459); the EKG was normal but the bloodwork revealed that he had elevated liver function (Tr. 457-58). In May of 2004, Dr. Boyajian referred Molloy to a specialist for Hepatitis C. (Tr. 449-50.) That summer, Molloy underwent multiple examinations, most of which reported normal results. An MRI study of Molloy's lumbar spine revealed degenerative changes at multiple levels, with a bulging disc at L5-S1 level. (Tr. 445.) Molloy's pelvis and hip x-rays returned normal (Tr. 446-47); a CT scan of the thorax revealed no thoracic mass (Tr. 443); a bone scan revealed degenerative changes of the spine but no metastases (Tr. 442); a CT scan of the pelvis showed no mass (Tr. 444); and a CT scan of the abdomen revealed no evidence of an abdominal mass or calculi (Tr. 441).

On August of 2004, Dr. Boyajian's report to the Commissioner stated that Molloy suffered from liver disease, depression, and anxiety. (Tr. 283.) He reported that Molloy was unable to sleep due to insomnia and was very depressed and nervous. (Id.) Dr. Boyajian found decreased range of motion in Molloy's lower back area due to degenerative changes. (Tr. 285.) He also stated that Molloy was limited in lifting and carrying; could stand or walk less than two hours in an eight hour workday; and was limited in pushing and pulling due to lower back pain. (Id.) He cited to Molloy's sleepiness, tiredness, and nervousness as objective signs of chronic

15

fatigue.  (Id.)

In September of 2004, Dr. Boyajian noted that Molloy was still drinking and had stopped going to AA meetings.  (Tr. 439-440.)  Dr. Boyajian noted at that time that Molloy's depression was improved while on Prozac and Klonopin.  (Id.)  He further noted that Molloy's stress test was normal and that he should return for follow up as needed.  (Tr. 432-34.)

In July of 2005, Molloy complained of leg pain, but the physical exam was unremarkable aside from decreased motion in the right hip.  (Tr. 431.)  Once again, Dr. Boyajian reported that Molloy's depression was stabilized on medications.  (Id.)  Dr. Boyajian recommended Hepatitis C follow ups and advised Molloy to stop abusing tobacco.  (Tr. 429-30.)  In August, Molloy reported he was feeling better and was stable on his medications.  (Tr. 428-30.)  Dr. Boyajian assessed that his depression and alcohol abuse were improved.  (Id.)  Dr. Boyajian noted in December that Molloy was able to ambulate without assistance.  (Tr. 424-28.)  Molloy had several examinations done again.  A lumbar spine MRI was taken and revealed L5-S1 and L4-L5 neural foraminal stenosis, but no spinal stenosis (Tr. 481); a brain MRI that revealed minimal small vessel ischemic and mild sinus disease (Tr. 482); and x-rays of the pelvis and hip returned normal, with minimal but no significant evidence of degenerative change (Tr. 483).

**2.  Dr. Alec Roy**

On January 4, 2006, Dr. Alec Roy examined Molloy at the request of the state agency. Dr. Roy found Molloy had no evidence of memory dysfunction, no problems with simple calculations, and no paranoia, delusions, or hallucinations.  (Tr. 332.)  Dr. Roy also reported that Molloy's speech and thinking processes were normal and that he was fully oriented to time, place and person.  (Id.)  Dr. Roy noted that, when prompted at the beginning of the appointment,

16

Molloy said that his "main problem" was "depression and Hepatitis C"  (Tr. 330); yet, when Dr. Roy asked what kept him from working, Molloy reported not psychiatry problems but that he "had a fall on January 19, 2004, and my right leg, I hurt my hip and I can't walk but two blocks" (Tr. 331-32).

### 3.  Dr. Ernesto Perdomo

On April 13, 2004, Molloy met with Dr. Ernesto Perdomo, a consultative examiner for the state agency.  Dr. Perdomo reported that Molloy was oriented to time, place and person, that his thought processes were well-organized and focused, and his speech was coherent and relevant.  (Tr. 279.)  He found Molloy's mood and affect were depressed.  (Id.)  Dr. Perdomo stated that Molloy's short term memory was "fair," and that his long term memory was "good." (Tr. 279.)  Dr. Perdomo diagnosed recurrent major depression, severe to moderate, without psychotic features; polysubstance dependence; personality disorder with self-defeating characteristics; chronic leg and back pain; severe psychosocial stressors including unemployment and lack of financial resources; and a global assessment of functioning ("GAF") score of 50.  (Tr. 280.)  Dr. Perdomo concluded that Molloy's "significant depression may effect his ability to function at a job."  (Id.)

### 4.  Dr. Lisa Zhang

On September 16, 2004, Dr. Lisa Zhang examined Molloy at the request of the state agency.  Dr. Zhang's examination revealed that Molloy did not appear to be in acute distress. (Tr. 289.)  She found no abnormalities in her examination of his skin, lymph nodes, head, eyes, ears, throat, chest, lungs, heart, and abdomen.  (Id.)  She reported that his gait, stance, and squat were normal; his cervical spine showed full flexion and full rotary movement; he had full range

17

of motion of shoulders, elbows, forearms, wrists, hips, knees and ankles; and he had 5/5 strength in the upper and lower extremities.  (Id.)  She found no motor or sensory deficit.  (Tr. 290.)  She also found that there was no evidence of impaired judgment or significant memory impairment and that he was oriented in all spheres and that his affect was normal.  (Id.)  She diagnosed Hepatitis C, depression, and anxiety and labeled his "prognosis" as "poor."  (Id.)  She noted that Molloy should follow up to treat his Hepatitis C to prevent complications.  (Tr. 290.)

### 5. Dr. Alexander Hoffman

On January 13, 2006, state agency consultative examiner Dr. Alexander Hoffman evaluated Molloy.  Dr. Hoffman reported that Molloy was intelligent and lucid.  (Tr. 336.)  He also found Molloy's memory was good.  (Id.)  He found that Molloy ambulated with normal gait; that his extraocular movements were full; and he could do a straight leg raise on his left side to about 70 degrees, and, on the right side, to about 45-50 degrees before complaining of back pain. (Tr. 337.)  He was able to walk on both heels and toes, stand on each leg individually with only a little difficulty in balance, and could do a deep knee bend halfway and could flex at the waist to within eight inches of the floor.  (Id.)  He found full range of motion at the elbow, shoulder, and wrist.  (Id.)  He also found Molloy's upper body grip strength was normal on the right but "slightly reduced on the left secondary to what he describes as an injury to his wrist several weeks ago."  (Id.)  In the "summary" section of the report, Dr. Hoffman noted that Molloy had "no particular problem" with regard to Hepatitis C at the time and that the "major problem" was that of depression.  (Id.)

### 6. Richard Molloy's Testimony

Molloy testified, facilitated by questioning from counsel, before ALJ O'Leary during the

18

hearing held on December 21, 2006.  (Tr. 42.)  He testified that he lived in a room by himself at the YMCA in Hoboken, New Jersey.  (Tr. 50.)  He stated he had not worked since September 18, 2001, at which time he was the manager of a furniture department for an expedition company. He stated that he lost his job and became a recluse.  (Id.)  Prior to that, his last jobs had been as an administrative assistant, executive assistant, and interior decorator.  (Id.)  He has a high school education.  (Tr. 50.)

He said he had been treated for anxiety before, but explained that when he saw the September 11, 2001 attacks from New Jersey, they "brung out all these fears that I never had before, fears of elevators, fears of, well, my mother was in the city and I have a fear of being claustrophobic."  (Tr. 51-52.)  The attacks "heightened" his anxiety "tremendously," he stated, continuing, "I could recall him changing my medications three and four times before he got me on the right medications just at least bring me to a calmness."  (Tr. 52.)  He stated that he went for treatment, offered through FEMA about three times a month for six months.  (Tr. 53-54.) After that point, he started sending out resumes but had no luck.  (Tr. 54.)

Molloy also explained that he had an accident in January, 2004, where he slipped on ice on the walkway in front of his two-family house in Secaucus.  (Tr. 55-56.)  This fall resulted in "severe" back pain that he believes had "gotten worse" over time.  (Tr. 56.)  He states he also has circulatory-type problems in his right lower calf, which has also gotten worse and has begun affecting the left leg.  (Tr. 57.)  He described the symptoms as a numbness, and a pain when he walks.  (Id.)  Because of it, he states he can only walk about two blocks or go only about halfway up the stairs because he has to stop, as the injury "basically takes my breath away and I have to calm my heart down."  (Id.)  He said his leg gave out on him eight times this year, and that every

time it does, he has to stop and wait for someone to help him up because it will take about ten minutes until the pain subsides.  (Id.)  Finally, he stated he also has constant pain around the back of his neck.  (Tr. 58.)

Regarding treatment, Molloy noted that he had qualified for charity care at two hospitals, but that the doctor there only treated him for psychiatry.  (Tr. 59.)  He stated although Dr. Boyajian wanted him to see a psychiatrist, he did not believe in psychiatry.  (Tr. 60.)  He said he had not seen someone for medical care since April of 2006 (a few months before the hearing), because Dr. Boyajian did not accept Medicaid and, although he had been treating him as a charity patient, he could no longer do so because Molloy's conditions had worsened.  (Id.)

Molloy also testified about his history of alcohol and drug use.  He stated that he drank "in order to numb the pain," which, unlike the counter medications nor prescription muscle relaxers and anti-inflammatories, was "the only thing that seemed to work."  (Tr. 61.)  He said he then went to a Mentally Ill Chemically Addicted Program ("MICA") for intensive day treatment, for six months, and also attended AA meetings.  (Tr. 62-63.)  The Jersey City program also made him aware of the things that trigger his depression: stress and family (with whom, except for his mother, he said he has cut off all connections).  (Tr. 64-65.)

Finally, Molloy described that he could not return to his prior manager-like jobs, where he had to sit most of the day.  (Tr. 65-66.)  He explained this is because he is "in constant pain," "can't sit still constantly" for more than "about an hour" because of his back, and cannot stand very long because his leg may go numb.  (Tr. 65-67.)  He did not explain how long he can stand, but said that it varies depending on the weather—for example, the condition worsens in rain, snow, and extreme humidity.  (Tr. 67.)  Molloy further elaborated that he could pick up at

20

maximum about fifteen pounds, but not frequently, and has to bend at his knees to pick up things. (Id.)  He also reported that he could not climb more than one or two flights of stairs, and that he has to stop a minimum of two times when walking up to his room on the third floor of the YMCA.  (Id.)  Molloy also testified about having incontinence issues, sometimes requiring a change of clothes.  (Tr. 68.)  He suffers from headaches of varying severity, with the severe ones lasting about an hour or two and occurring a couple times a month.  (Tr. 68-69.)  Lastly, he discussed that he has a history of stomach problems since he had colitis as a teenager and a history of Hepatitis since early 2001, for which Dr. Boyajian persuaded him to cut back on his drinking.  (Tr. 69-70.)

When ALJ O'Leary asked if any doctors had recommended back surgery, Molloy responded that they had, but could only guarantee a 50/50 chance of walking again, and that his one friend who had back surgery experienced greater pain post-surgery.  (Tr. 70-71.)  ALJ O'Leary pointed out that a doctor who would recommend back surgery given a 50/50 chance of walking was inconsistent with his experience, but Molloy stated he did not recall the doctor's name because he had only seen him once.  (Tr. 71.)

ALJ O'Leary also asked about Molloy's daily activities.  Molloy described that he usually stays in his room and watches TV when he is not at the MICA program.  (Tr. 73.)  He goes to the corner store on a regular basis, and uses public transportation to get around.  (Id.)

## IV. ANALYSIS

### A.    Supplemental Security Income Claim

Molloy makes several arguments attacking the Commissioner's denial of benefits on his SSI application.  Each fails because this Court finds that there is substantial evidence supporting

the Commissioner's decision.

### 1. Weight Assigned to Evidence

In this case, Molloy argues that ALJ O'Leary erred by failing to assign a specific weight to the medical opinions of: state agency non-examining physicians; Alec Roy, M.D.; and Ernesto Perdomo, M.D.  (Pl.'s Br. 21); 20 C.F.R. § 416.927(f)(2)(ii); S.S.R. 96-6p.  Each of these arguments fail because ALJ O'Leary did appropriately consider and analyze these medical opinions.

Molloy argues that ALJ O'Leary failed to state what weight he gave to the state agency evaluators who "determined that Mr. Molloy had moderate limitations in 13 categories of mental function."  (Pl.'s Br. 21; see also Tr. 309-10.)  Molloy misunderstands the evaluators' report. The part of the report to which Molloy refers is entitled "Summary Conclusions," and consists only of check-boxes to indicate the presence and degree of a given functional limitation. According to the Social Security Administration's internal operating guidelines (the Program Operations Manual System (POMS)), this section of the examination form "does not constitute the RFC assessment" but rather "is merely a worksheet to aid" employees.  POMS DI 24510.060. Therefore, ALJ O'Leary was not required to assign *any* weight to this part of the report because it was not the final RFC finding.

The evaluators' assessment of Molloy's RFC is instead provided in Section III of the form, entitled "Functional Capacity Assessment."  Id.  In this narrative section, the evaluators found that although Molloy "presents with depression complicated by substance abuse he appears capable of managing low contact, routine tasks."  (Tr. 311.)  In other words, the evaluators' final RFC assessment was that Molloy remained capable of doing certain work.  Although ALJ

O'Leary did fail to assign a specific weight to this conclusion that bears against a finding of disability, unsurprisingly, Molloy does not take issue.[14]

With regard to the opinions of Drs. Roy and Perdomo, Molloy claims that ALJ O'Leary "failed to follow [the] rules" of 20 C.F.R. § 416.927(d),[15] (Pl.'s Br. 20),  which require that several factors be considered when weighing evidence, including specialty, treating relationship, supportability, and consistency with the evidence, 20 C.F.R. § 416.927(d).  Molloy admits, however, that ALJ O'Leary considered the opinions of Dr. Roy and Dr. Perdomo when making his decision.  (See Pl.'s Br. 21 (noting ALJ O'Leary summarized the opinions); Tr. 21-22.)

This argument is unpersuasive.  While it cannot be denied that ALJ O'Leary did not assign a specific amount of weight to either of these opinions, the rationale underlying the requirement of express analysis is targeted primarily at the times when the Commissioner rejects or otherwise discounts some evidence in the record.  See Norris v. Barnhart, 197 F. App'x 771 at *3 (10th Cir. 2007) ("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened.") (citing Howard v. Barnhart, 379 F.3d 945, 947 (10th Cir. 2004)); 20 C.F.R. § 416.927(c)(1)-(2) (explaining that weighting of evidence occurs only when evidence is inconsistent with the record or internally inconsistent).

---

[14]  It can be reasonably assumed that that ALJ O'Leary considered these conclusions, given his ultimate RFC finding that Molloy was capable of light, simple work.  (Tr. 36.)  ALJ O'Leary also specifically stated that his RFC conclusion was "supported by highly qualified state Agency medical consultants who also found that the claimant could perform light work."  (Id.)  This opinion was rendered by Dr. Carlos Gieseken on May 4, 2004.  (Tr. 311.)  Another state agency consultant, Dr. Frances Hecker, in an opinion not disputed in Molloy's brief, also concluded that Molloy had the RFC to perform simple, routine tasks.  (Tr. 342.)

[15]  Molloy cites to 20 C.F.R. § 404.1527(d), which applies to DIB claims.  The corresponding statute for an SSI claim is 20 C.F.R. § 416.927.

In this vein, ALJ O'Leary explained his rationale for affording no significant weight to the opinions of Molloy's treating physician, Dr. Boyajian (discussed below), and for finding Molloy's testimony not entirely credible (which Molloy has not disputed on appeal). The opinions of Drs. Roy and Perdomo, however, are generally consistent with the rest of the record and support ALJ O'Leary's final conclusion. As such, the need to expressly assign weight or explicitly consider the weighing factors is lessened because ALJ O'Leary's consideration of, and reliance on, their opinions is evident.

Moreover, ALJ O'Leary's thorough development of the record evinces implicit consideration of the factors which affect weight.[16] For instance, ALJ O'Leary stated that both of these doctors conducted consultative exams at the request of the state agency. (Tr. 21, 25.) Such a statement about the physician's position and role implies his consideration of the "treatment relationship," one of the factors affecting weight. See 20 C.F.R. § 416.927(d)(1)-(2); Hulbert v. Comm'r of Social Sec., 2009 WL 2823739 *15 (N.D.N.Y. Aug. 31, 2009) (finding ALJ indicated consideration of nature of examining relationship by noting physician was one-time examiner).

ALJ O'Leary's decision also reflects his consideration of the "supportability" of the

---

[16] This Court cautions that the Commissioner's opinion is not redeemed merely by the fact that "the ALJ specifically stated that he considered all opinions pursuant to the regulations," although the Commissioner has presented this as its defense to Molloy's argument. (Def.'s Br. 20 n.2; Tr. 32.) This boilerplate language does not substitute for the consideration and analysis that is necessary to permit meaningful judicial review of an administrative law judge's opinion under Burnett. See, e.g., Hemphill, 2002 WL 32348348 *4-6 (E.D. Pa. Apr. 5, 2002) (remanding for explanation of the relative weights accorded or of the relevant standards as applied to state agency physicians' opinions who contradicted claimant's treating physician, even though ALJ had summarized their opinions and said that the reports were "considered under the standards set forth in the Regulations (20 C.F.R. § 416.927, 20 C.F.R. § 416.928) and Social Security Rulings 96-2p and 96-5p.").

medical opinions.  See 20 C.F.R. § 416.927(d)(3).  For example, Dr. Roy's and Dr. Perdomo's

opinions are substantiated by actual clinical findings, which ALJ O'Leary noted.  For instance,

Dr. Roy explained, "[c]linically, there is no evidence of memory dysfunction.  He could, for

example, repeat back the 5 numbers 8, 7, 1, 6, 9 quickly and accurately at first attempt."  (Tr. 332

(medical report), 26 (cited in decision).)  Dr. Perdomo made similar observations, noting, for

example, that Molloy's "[c]oncentration appeared to be mildly impaired to fair.  He was able to

follow the interview, but was not able to give a Serial 3, (100 minus 3 serially, he made a lot of

errors and gave up)."  (Tr. 279 (medical report), 22 (cited in decision).)

       Lastly, ALJ O'Leary recognized that both of the doctors' opinions were consistent with

the record.  See 20 C.F.R. § 416.927(d)(4).  The consistency of the greater part of the record is

evident, for instance, through ALJ O'Leary's thorough recitation of the relevant reports.  (Tr.

20-30.)  Perhaps most clearly, the consistency of the record is evident in ALJ O'Leary's

explanation for why he did not find Molloy's testimony entirely credible.  Specifically, ALJ

O'Leary highlights that medical tests consistently showed no objective signs of disability:

> there are no radiographic or clinical findings which would come close to support
> the degree of inability alleged.  Every physical examination reflects full motor
> strength of both the upper and lower extremities bilaterally.  Every physical
> examination chronicles the claimant to have a normal gait and station, without the
> need of any assistive device.  The claimant has never been hospitalized for any
> orthopedic reason.  There is no indication that he has ever required potent pain
> medications.  It appears that he has relied solely upon the relatively mild
> over-the-counter medications or anti-inflammatory medications for pain
> alleviations.

(Tr. 35.)

       In arguing that ALJ O'Leary neglected to weigh the doctors' opinions, Molloy points out

that both doctors concluded Molloy had a GAF score of 50, and that Dr. Perdomo's exam also

revealed "depressed mood and only fair short term memory." (Pl.'s Br. 21.) However, these findings do not discredit ALJ O'Leary's final decision. A GAF score is only numerical summary of a clinician's judgment of the individual's overall level of functioning, taking into account social, psychological, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000). ALJ O'Leary noted the doctors' GAF scores but also noted the doctors' more detailed findings that preceded the GAF determination. Both of the doctors made numerous observations detailing the extent of Molloy's capabilities in various areas of functioning, such as speech, memory, and mental state. These findings support ALJ O'Leary's decision and there is no requirement that ALJ O'Leary specifically rely on a GAF score in place of the physicians' lengthier recapitulation of the examination. See Blalock, 483 F.2d at 775.

Although ALJ O'Leary did not explicitly assign a certain quantum of weight or enumerate the factors affecting weight with regard to some of the medical opinions, ALJ O'Leary sufficiently developed the record to permit meaningful judicial review. The record demonstrates that substantial evidence supports ALJ O'Leary's consideration of the opinions of Dr. Roy, Dr. Perdomo, and the state agency non-examining physicians in reaching his final decision. Therefore, remand is not required on this basis.

### 2. No Significant Weight Accorded to Dr. Boyajian

Molloy argues that ALJ O'Leary was incorrect in assigning "no significant weight" to the opinion of Dr. Robert Boyajian, Molloy's treating physician, who diagnosed Molloy as disabled.[17] (Pl.'s Br. 22.) Molloy cites particularly to Dr. Boyajian's August 3, 2004 medical

---

[17]  The Commissioner is correct in observing that Dr. Boyijian's finding that Molloy is "disabled" or "unable to work" is a finding reserved to the Commissioner. (Tr. 36); 20 C.F.R. §§ 404.1527(e), 416.927(e).

26

report, in which Dr. Boyajian stated that Molloy was fatigued most of the day, required two to three hours of rest, could not stand or walk more than two hours in a work day, and was limited in pushing, pulling, and postural activities.  (Id.; Tr. 283-87.)  Molloy urges that there is substantial evidence which warrants according Dr. Boyajian's report "controlling weight."

The Act delineates the circumstances under which a treating physician's opinions are given "controlling weight": "controlling weight" is accorded to a treating physician whose opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 416.927(d)(2).  If ALJ O'Leary discounts the opinion of a treating physician, he must articulate the reasons for doing so, using the factors which affect weight (e.g., length and frequency of treatment, physician's specialty, objective evidence supporting the opinion, and consistency with the record).  20 C.F.R. § 416.927(d).

This Court finds that there is substantial evidence to support ALJ O'Leary's decision. ALJ O'Leary explained exactly the shortcomings of Dr. Boyajian's findings when he accorded them no significant weight:

> [Dr. Boyajian's] assessment is not supported by his own findings and inconsistent with the weight of the medical evidence. . . . Dr. Boyajian does not cite any specific clinical findings to support the limitations asserted.  His opinions . . . are based in substantial part on the claimant's self-reporting of symptoms, and his reports consistently have a dearth of objective, clinical findings.  Additionally, his specialty is family practice rather than psychiatry or orthopedics.

(Tr. 36.)  The record, discussed below, exposes precisely these critical flaws: a dearth of objective evidence and the inconsistency of Dr. Boyajian's report with the rest of the record.

Molloy argues that ALJ O'Leary's reasoning is "demonstrably false," because, for

27

instance, in his report, Dr. Boyajian cited to objective findings such as "degenerative changes" as the reason for the decreased range of motion in his lower back, and to lumbar spine abnormalities for the limited ability to stand, sit, and walk.[18]  (Pl.'s Br. 22.)  "Degenerative changes" might explain a limited range of motion, but a plausible explanation, through a general reference to a process of changes that occurs with aging, is not equivalent to objective support, through citing of specific clinical findings.  The only objective finding to which Molloy references in support of Dr. Boyajian's report is an MRI of the lumbar spine.  (Id.)  Yet, as the Commissioner notes in his brief, this MRI post-dates Dr. Boyajian's report, and thus could not have been the basis for it. (Tr. 423, 445.)

Molloy also claims that ALJ O'Leary ignored much of the objective evidence which would provide support to accord significant weight to the findings of Dr. Boyajian.  Molloy is mistaken.

ALJ O'Leary explicitly considered a plethora of evidence, including that to which Molloy cites for this argument.  First, Molloy refers to the the December 2005 lumbar spine MRI, mentioned above.  (Pl.'s Br. 23.)  This was considered by ALJ O'Leary, as was an earlier MRI, showing similar degenerative changes and disc bulges.  (Tr. 22, 24.)  Second, Molloy cites to an August 2004 bone scan showing cervical arthritis.  (Pl.'s Br. 23.)  ALJ O'Leary identified this scan and noted that it revealed degenerative changes but no evidence of metastases, no pelvic

---

[18]  Molloy also states ALJ O'Leary was wrong for stating that Dr. Boyajian "does not cite any significant functional deficits related to . . . orthopedic status." (Pl.'s Br. 23; Tr. 36.) Molloy cites to Dr. Boyajian's report, which, as discussed, notes limitations in the ability to walk, stand, push, and pull.  (Tr. 283-87.)  However, as ALJ O'Leary remarked, most, if not all, of these findings are based on Molloy's subjective claims.  (Id.)  Subjective complaints of symptoms, in the absence of objective data, cannot alone form the basis of a disability finding under the Act. 20 C.F.R. § 416.929(a).

mass, and no abdominal mass.  (Tr. 22.)  Third, Molloy cites to a December 2005 MRI of the

brain which shows ischemic vessel changes, supporting his headache complaints.  (Pl.'s Br. 23.)

ALJ O'Leary recognized that this exam showed "minimal small vessel ischemic" as well as

"mild sinus disease," but "no acute pathology."  (Tr. 24-25.)  Lastly, Molloy points out that a

May 2004 serum lab test revealed liver disease that is consistent with his claims of chronic

fatigue.  (Pl.'s Br. 23.)  ALJ O'Leary recognized this, and it is reflected in the record—"Dr.

Boyajian discussed the Hepatitis C findings with the claimant and referred him to a specialist."[19]

(Tr. 22.)

Next, Molloy points out that "two examining psychiatrists mirrored [Dr. Boyajian's]

opinion that Mr. Molloy has serious psychiatric problems."  (Pl.'s Br. 23.)  Molloy appears to be

referring to the psychiatric consultant reports of Drs. Ernesto Perdomo and Alec Roy.  (Tr.

277-81, 330-34.)  ALJ O'Leary did not ignore these.  He openly acknowledges that Molloy's

record has significant evidence related to depression; this is why he found that Molloy had

impairments including depression and anxiety (Tr. 20), and why two of the three impairment

listings he focused on under Step 3 were affective disorders and anxiety related disorders (Tr.

30).  These findings do not, however, change the problem of inconsistencies and lack of

objective support related to Dr. Boyajian's findings that Molloy is significantly limited in his

*physical* exertion abilities.  The mere fact that two opinions mirrored a certain subset of Dr.

Boyajian's findings, namely, depression, does not require ALJ O'Leary to afford a greater

quantum of weight to Dr. Boyajian's opinions.

Finally, Molloy argues that "[t]he ALJ decision indicates that Dr. Zhang and Dr.

---

[19]   ALJ O'Leary considered evidence of liver disease in the record and found, under Step
3, that Molloy did not meet Listing 5.05 ("chronic liver disease").  (Tr. 32.)

Hoffman's reports (agency consultative examiners) indicate only slight physical problems, and provide good reason for rejecting Dr. Boyajin's [sic] findings.  In actuality, Dr. Zhang agreed that Mr. Molloy had hepatitis, depression, and anxiety, and rated his prognosis as 'poor.'  Dr. Hoffman documented that Mr. Molloy has a history of multiple suicide attempts, and complaints of difficulty ambulating more than short distances."  (Pl.'s Br. 24.)

This argument has no substance.  The record reveals that ALJ O'Leary's conclusion, that Dr. Zhang and Dr. Hoffman found only slight physical problems, is accurate.  Dr. Zhang examined Molloy on September 16, 2004, just over one month after Dr. Boyajian's report.  (Tr. 288-90.)  Dr. Zhang found that Molloy was able to complete the routine physical examination without trouble.  The fact that she diagnosed Hepatitis C and depression or that she considered his prognosis as "poor" does not detract from her findings regarding his current physical abilities.  (Tr. 290.)  She simply stated that Molloy should follow up with his physician to treat his Hepatitis and with his psychiatrist to treat his mental illness.  (Id.)  Still, at the time, she found, for his mental status screening, that Molloy had "[n]o evidence of impaired judgment or significant memory impairment" and "normal" affect. (Id.)

Dr. Hoffman made similar findings after examining Molloy on January 4, 2006.  He found a slight limitation in Molloy's ability to do a straight leg raise on his right side and in his upper body grip strength on his left.  Although Molloy relies on Dr. Hoffman's report for its statement that Molloy has had pain "exacerbated by any type of ambulation more than 1 or 2 blocks," this was not a finding by Dr. Hoffman, but merely his record of Molloy's self-reported history.  (Tr. 335.)  Indeed, Dr. Hoffman noted that although Molloy complained of lower back and right hip and leg pains, "[h]e has numerous diagnostic tests but no particular diagnosis has

been reached," and that "[h]e has had no particular physical therapy for this condition."  (Tr. 335.)

The record demonstrates that ALJ O'Leary appropriately considered the factors affecting weight, including Dr. Boyajian's specialty, the lack of clinical support for his conclusions, and the inconsistency between his report and the remainder of the record.  There is substantial evidence supporting the Commisioner's decision to accord no significant weight to Dr. Boyajian's findings.

### 3. Requirements of Past Work

Molloy argues that ALJ O'Leary failed to define the requirements of his past relevant work under Step 4.  (Pl.'s Br. 24-25.)  Burnett dictates that the Step 4 analysis has three substep requirements, the second of which is that "the ALJ must make findings of the physical and mental demands of the claimant's past relevant work."  Burnett, 220 F.3d at 120.  This precedes the third substep, during which the ALJ must determine if a claimant has retained, despite his disability, the capacity to perform that past relevant work.

Although ALJ O'Leary did not explicitly articulate the demands of Molloy's past work, the record is ample on this point.  ALJ O'Leary's Step 4 conclusion that Molloy is capable of performing his past work is substantially supported by the record.  ALJ O'Leary labeled Molloy's past relevant work as a "clerical worker."  (Tr. 37.)  Sources such as the *Dictionary of Occupational Titles* ("DOT") may be used to define a job as it is usually performed in the national economy.  See Burnett, 220 F.3d at 123-24.  The DOT defines the general requirements of clerical work and states that the physical demands of the job fall into the "light" category. Dictionary of Occupational Titles 180 (5th ed. 2003) (code 209.565-010).  Work categorized as

"light" under the Act "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when . . . it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

While there are some minor inconsistencies in the record, there is substantial evidence in the exhibits, and in Molloy's testimony, that the nature of his past work fits within the definition of "light" physical exertion.  Molloy testified that he has had jobs that require sitting "most of the day," like "manager jobs."  (Tr. 65.)  He also testified that his last job was as a furniture department manager, which is also demonstrated in a work history report he created.  (Tr. 50, 260.)  A work history report from February 2004, to which Molloy's counsel directed ALJ O'Leary during the hearing, describes Molloy's work history as involving telecommunications management, department store sales, telecommunications secretarial work, and, most recently, a trade shows contractor.  (Tr. 46, 172-73.)  The work requirements that are detailed in that report are for his first job, the "management" position, his longest held job.  (Tr. 172.)  The report states that job required seven hours of sitting, two hours of walking, one hour of standing, maximum lifting of ten pounds, and frequent lifting of one pound.  (Tr. 172-73.)

Although Molloy has not presented this point, it appears that the only evidence suggesting that Molloy's past work includes a more rigorous physical commitment is an undated work history report.  This report is the only work report purporting to describe his most recent job, while the other reports describe his longest held job, which was over 15 years ago.[20]  See 20

---

[20]  The work history report cited to during the hearing details his management position at Verizon Telephone Co. and AT&T, where he stated he worked from 4/27/1974 to 1/31/87.  (Tr. 172.)

C.F.R. § 416.965(a) ("We consider that your work experience applies when it was done within the last 15 years. . . ."). The report describes only two jobs, most recently as a "clerk" at a "telecommunications office," held from 1997 until 2001, and prior to that, as "office clerk," at "offices," held from 1992-1993. (Tr. 227.)

This is inconsistent with the job descriptions and dates of employment offered in his other reports and in his testimony.[21] The report is also internally inconsistent: the job description of the clerk position states that "[Molloy] had to input information into our computer system," but then states that there was lifting and carrying of chairs and tables involved. (Tr. 228.) The report also states that the heaviest weight that was lifted was 20 pounds, but that there was frequent lifting of 25 pounds. (Id.)

Having considered the internal inconsistency of this report as well as its inconsistency with the record as a whole, and especially considering Molloy's own job descriptions at his testimony, this Court finds substantial evidence supports ALJ O'Leary's determination of Molloy's past relevant work under Step 4. ALJ O'Leary finding that Molloy's past work was that of a clerical worker is substantially supported and appropriately defined through the record and the common use of "clerical work" as used in the *Dictionary of Occupational Titles*.

### 4. Inconsistency in RFC

Molloy argues that ALJ O'Leary failed to make a "clear detailed statement" of Molloy's RFC.[22] (Pl.'s Br. 25.) He asserts that ALJ O'Leary's decision is internally inconsistent, and not

---

[21] For instance, the 1997 start date of the "clerk" job conflicts with the dates of employment he listed in his other reports, where he said his most recent job as a trade show worker began in December 1998 or 1999. (Tr. 172, 227, 260.)

[22] Molloy also states that ALJ O'Leary did not make a "clear detailed statement of the requirements of plaintiff's past work," (Pl.'s Br. 25); however, this issue has already been addressed above.

supported by substantial evidence.  (Id.)  The only evidence proffered in support of this allegation

is that ALJ O'Leary "found that Mr. Molloy had moderate mental limitations in social function,

concentration, persistence and pace at one point in his decision.  Elsewhere, the ALJ found that

plaintiff's only mental limitation was to 'simple' work."  (Id.)  In light of ALJ O'Leary's detailed

discussion preceding his determination of Molloy's RFC, which is supported by substantial

evidence, remand is not warranted on this ground.

Molloy's argument rests on a disconcerting mischaracterization of ALJ O'Leary's

findings in an attempt to find a contradiction when, in fact, two simply different inquiries are at

hand.  The moderate mental limitations that ALJ O'Leary found in terms of social function and

concentration, persistence and pace were made under Step 3 in order to assess whether Molloy

met or equaled any of the impairments presumed so severe as to preclude any gainful

employment, thus qualifying Molloy for disability benefits without further analysis.[23]  ALJ

O'Leary's subsequent finding that Molloy is capable of "simple" work was made under a Step 4

analysis.  An RFC to perform "simple light work activity" is not a "mental limitation," as Molloy

incorrectly describes.  Quite literally, an RFC measurement aims to synthesize the opposite of a

mental limitation—residual functional capacity is defined as "the most you can still do *despite*

your limitations."  20 C.F.R. § 416.945(a)(1) (emphasis added).  There is no inconsistency, actual

or theoretical, between ALJ O'Leary's findings that Molloy has moderate mental limitations in

social function and concentration, persistence and pace, and that Molloy has the capacity to do

---

[23]  To satisfy the impairments in the Listings, either the criteria in paragraphs "b" and "c" of each impairment must be satisfied. Paragraph "b" requires marked or repeated limitations in at least two of four mental functional areas: activities of daily living; social functioning; maintaining concentration, persistence, pace; and repeated episodes of decompensation each of extended duration.  (Tr. 30.; see also 20 C.F.R. pt. 404, subpt. P, app. 1.)

simple work.[24]

Molloy relies on <u>Ramirez</u> for support.  <u>Ramirez v. Barnhart</u>, 372 F.3d 546 (3d Cir. 2004).

In <u>Ramirez</u>, the ALJ did not include, in his Step 5 hypothetical to a vocational expert, his

findings as to the plaintiff's deficiencies in concentration, persistence and pace.  <u>Id.</u>  The Circuit

court found that because of this, the hypothetical did not adequately capture all of the

Commissioner's observations about Ramirez's limitations, as required, and that if it had, the

vocational expert might have given a different answer.  <u>See id.</u> at 552, 555-56.

The Commissioner in that case relied upon S.S.R. 96-8p, which held that these mental

limitation findings, made under paragraphs (b) and (c) in the impairment listings under Step 3,

were "not an RFC assessment," but were only used to rate the severity of impairments at Steps 2

and 3.  <u>Id.</u> at 555.  The Circuit court found that although S.S.R. 96-8p said that an RFC

determination under Steps 4 and 5 required a "more detailed assessment" than under Step 3,

nothing prohibited the Step 3 findings from also playing a role in Steps 4 and 5.  <u>Id.</u>

<u>Ramirez</u> is easily distinguished.  In Molloy's case, there is not the delicate situation of

presenting an accurate hypothetical in order to elicit an appropriate answer from a stranger to the

case.  <u>Ramirez</u> does not require that ALJ O'Leary explicitly repeat his Step 3 findings when

performing his Step 4 analysis.  Having already found meritless Molloy's claim about the

---

[24]  Molloy also states elsewhere that the evaluators' finding of moderate limitations in 13 categories of mental function "drastically conflicts" with ALJ O'Leary's "finding of limitation in only one mental category (limit to 'simple' work)."  (Pl.'s Br. 21.)  Once again, Molloy's characterization of an RFC finding is incorrect.  An RFC is not a finding of a mental category limitation; an RFC to perform simple work is a Step 4 conclusion, of remaining capacity. Moreover, the evaluators did not find moderate limitations in 13 mental categories: as noted above, that finding is a worksheet aid preceding the final RFC finding, and does not constitute an RFC finding.  <u>See</u> discussion <u>supra</u> part IV.A.1 (discussing Molloy's argument that Commissioner failed to assign a weight to the findings of the state evaluators).

"inconsistency" in his limitations as found Step 3 and Step 4, there is no evidence in ALJ

O'Leary's decision, read as a whole, that he failed to consider, or otherwise betrayed, his Step 3

findings when making his Step 4 determination.  In addition, as the Commissioner alludes, even

if we were to assume that ALJ O'Leary somehow failed to allow his Step 3 findings to "play a

role" in his Step 4 determination, unlike in Ramirez, there is no evidence that his failure may

have led to a different result.  See Santiago-Rivera v. Barnhart, No. 05-5698, 2006 WL 2794189

*11-12 (E.D. Pa. Sept. 26, 2006) (distinguishing Ramirez because the record did not suggest, as

it did in Ramirez, that greater specificity was required for an adequate hypothetical).

Furthermore, there is no requirement that ALJ O'Leary's finding of deficiencies in these

areas requires a more detailed requirement of Molloy's RFC.  "Simple, light work," read in the

context of the decision, where ALJ O'Leary did assess certain functional limitations, is

sufficiently specific.  For five pages, ALJ O'Leary discusses Molloy's testimony and medical

records, explaining why he finds Molloy's testimony to be "not entirely credible" and why he has

afforded "no significant weight" to Dr. Boyajian's reports.  (See Tr. 31-37.)  ALJ O'Leary also

considered the categories of limitations under Step 3, by considering the findings about Molloy's

daily life activities, concentration, and social function.  See e.g., Galvin v. Comm'r of Soc. Sec.,

No. 08-1317, 2009 WL 2177216 *10 (W.D. Pa. July 22, 2009) (finding ALJ conclusion that

claimant was limited to simple, routine tasks was not unduly vague, especially after ALJ had

made detailed findings preceding the RFC conclusion).

Because ALJ O'Leary's finding of Molloy's RFC is both sufficiently detailed and

supported by substantial evidence, remand is not required for further development on the issue.

**5. Treatment Non-Compliance / Drug Materiality**

Lastly, Molloy challenges, on his SSI claim, ALJ O'Leary's "finding of drug or alcohol materiality" and finding of "fail[ure] to follow prescribed treatment." (Pl.'s Br. 26-27.) Molloy has two arguments. First, he claims ALJ O'Leary made legal errors in his analysis underlying both findings. Second, he claims that the adjudication of these two issues violated his due process rights because neither was named in the notice of hearing.

**a. Statutory Analysis**

Molloy claims that ALJ O'Leary erred in his analysis of the treatment noncompliance and drug or alcohol materiality findings. Findings of treatment noncompliance and of drug or alcohol materiality generally render a claimant ineligible for benefits. See 42 U.S.C. § 1382c(a)(3)(J); 20 C.F.R. § 416.930(a). A finding of drug or alcohol materiality is made in accordance with 20 C.F.R. § 416.935, which states that for claimants who are found disabled and have medical evidence of drug addiction or alcoholism, an ALJ must determine if the drug addiction or alcoholism is a contributing factor *material* to the determination of disability. Treatment noncompliance findings are made pursuant to 20 C.F.R. § 416.930, which states that to be eligible for benefits, a claimant must follow treatment prescribed by his physician if it can restore his ability to work, unless the claimant has a "good reason" for failure to comply. 20 C.F.R. § 416.930(a)-(b).

Regarding the drug and alcohol materiality, Molloy argues that ALJ O'Leary erred because he did not first make a finding that Molloy is disabled, which Molloy claims is required under the Act. (Pl.'s Br. at 26.) Regarding the treatment noncompliance finding, Molloy claims ALJ O'Leary failed to consider the effects of Molloy's poverty and mental illness in his ability to

37

access prescribed healthcare.

Molloy's arguments are misguided.  First, although ALJ O'Leary has muddled the issues

somewhat, he has, in fact, issued a decision only as to Molloy's treatment noncompliance, not

drug or alcohol materiality.  ALJ O'Leary stated in his decision:

> [t]he evidence documents that the claimant was involved in active and chronic alcohol
> and drug abuse . . . he was non-compliant with treatment for his liver disease; a disorder
> known to be precipitated by long-term, excessive alcohol abuse.  Administrative notice is
> made of the fact that alcohol abuse is contraindicated for any individual, especially one
> purporting to be suffering from diabetes and depression.  Therefore, even if the evidence
> supported a finding that these impairments were disabling during the relevant timeframe,
> a finding of disabled would nevertheless be inappropriate pursuant to 20 C.F.R. . . .
> 416.930, due to the claimant's failure to follow prescribed treatment.

(Tr. 37.)[25]  ALJ O'Leary's finding of noncompliance happens to be intertwined with Molloy's

alcohol use because the "treatment" with which ALJ O'Leary finds Molloy has failed to comply

is that of ending his excessive alcohol use.

Molloy's argument regarding the drug and alcohol materiality finding fails.  As the

decision clearly states, this finding was an *alternative* finding.  ALJ O'Leary did not find Molloy

to be disabled and did not conclude that Molloy was ineligible for benefits due to drug or alcohol

materiality.  In light of this Court's conclusion that substantial evidence supports the

Commissioner's decision to deny Molloy's SSI application, ALJ O'Leary's alternative basis for

denying disability, on the grounds of treatment noncompliance, is moot.  Moreover, ALJ

O'Leary's decision suggests complete compliance with the sequential analysis that Molloy argues

---

[25]    ALJ O'Leary has also elsewhere noted Molloy's treatment noncompliance, by
referencing Dr. Boyajian's report that Molloy had been noncompliant with his treatment at the
clinic.  (Tr. 32.)

However, ALJ O'Leary has conflated the issues of treatment noncompliance and drug
materiality.  On the second page of his decision, where he listed the issues to be decided, he did
not include the issue of treatment noncompliance, but instead included the issue of whether
substance abuse was a material contributing factor. (Tr. 18.)

for: ALJ O'Leary stated that *if* disability were found, *then* treatment noncompliance/drug materiality would make Molloy ineligible for benefits.

Similarly, even if the Commissioner had made a finding of treatment noncompliance, it is only an alternative finding and need not be addressed here because the issue is moot.[26]

Because this Court finds substantial evidence supporting ALJ O'Leary's principal finding that Molloy was not disabled, within the meaning of the Act, for the time period alleged, the arguments regarding analytical errors for ALJ O'Leary's alternative findings, whether drug materiality or treatment noncompliance, do not affect the disposition of this case.

**b. Due Process**

Molloy also argues that the notice of hearing was constitutionally insufficient because the notice did not identify drug materiality or treatment compliance as issues for the hearing. This argument is flawed.

A plaintiff alleging a violation of constitutional due process must possess a protected liberty or property interest. See, e.g., Kelly v. Railroad Retirement Bd., 625 F.2d 486, 489 (3d Cir. 1980). A person may have a property interest in a benefit if he has a "legitimate claim of entitlement to it," not just an "abstract need or desire," or a "mere unilateral expectation." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). The Third Circuit has stated that SSI applicants, even before having received benefits, are entitled to procedural due process. Torres v. Chater, 125 F.3d 166, 169 (3d Cir. 1997) (stating claimant who was applicant, not recipient, of SSI was

---

[26]    Moreover, Molloy has not suggested how his poverty or mental illness affected his ability follow the treatment that was prescribed: that is, to end his use of alcohol and go to clinics. (See Pl.'s Br. 25-27.)  At his hearing, Molloy never once makes reference to a mental illness as a problem, and references his poverty only to indicate that he is unable to obtain private medical care. (Tr. 59-65.)

in category of individuals protected by procedural due process) (citing <u>Railroad Retirement Bd.</u>, 625 F.2d at 489-90 (holding due process attaches at welfare claimants' determination of ineligibility, whether made at the outset or after receipt of benefits)).[27]

"The fundamental requisite of due process of law is the opportunity to be heard" at a "meaningful time and in a meaningful manner." <u>Goldberg v. Kelly</u>, 397 U.S. 254, 267 (1970) (citations omitted). To ensure that an opportunity to be heard is meaningful, the Due Process Clause requires that adequate notice of a hearing be provided. <u>See</u> <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314 (1950) ("Th[e] right to be heard has little reality or worth unless one is informed that the matter [affecting one's property rights] is pending and can choose for himself whether to appear or default, acquiesce or contest."). Generally, notice must be sufficiently adequate so as to apprise the individual of the issues so that he has the opportunity to present his defense in a full and fair hearing. <u>See</u> <u>Landon v. Plasencia</u>, 459 U.S. 21, 39 (1982); <u>Memphis light, Gas & Water Division v. Craft</u>, 436 U.S. 1, 14 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'").

In this case, Molloy presents no facts which suggest that he was not given adequate notice and a reasonable opportunity to be heard. It was Molloy who testified and submitted evidence about his prior drug and alcohol abuse and about his compliance with prescribed treatment.

---

[27] The Supreme Court has not yet held that applicants (rather than continuing recipients) of SSI or DIB have a property interest in the prospective benefits. Most circuit courts, however, have held that applicants have a property interest in the benefits arising from statutory and regulatory regimes which mandate a defined administrative outcome, thereby limiting officials' discretion to grant or deny the benefit. <u>See</u> <u>Kapps v. Wing</u>, 404 F.3d 105, 115 (2d Cir. 2005) (reviewing appellate cases discussing applicants of benefits); <u>Town of Castle Rock v. Gonzales</u>, 545 U.S. 748, 756 (2005) ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.").

Molloy's counsel also stated that he had reviewed the evidence in the record.  (Tr. 42.)  As such, it is difficult to imagine how Molloy could be said to have been denied a reasonable opportunity to be heard on the issue of drug materiality and treatment noncompliance.

Molloy has not presented any precedent supporting his position that adequate notice requires specific notice of the drug materiality or treatment noncompliance issues.  The notice of hearing that Molloy received stated that the issues to be considered in his case were his DIB and SSI claims, filed in 2005.  (Tr. 122.)  The notice further reviewed the basic eligibility issues under each application, for example, noting the definition of physical or mental impairment that qualifies as a disability under the Act.  (Tr. 122-23.)

Thus, Molloy had notice that both his SSI and DIB claims were at issue.  Drug materiality and treatment noncompliance are issues that are encompassed within the regulatory framework defining eligibility for SSI and DIB claims.  An ALJ's findings regarding each issue are made pursuant to provisions of the Act which clearly set forth the possibility and significance of such findings, should they be applicable in any given case.

Plaintiff has not suggested any basis for distinguishing which of the findings that the Commissioner is permitted to make under the Act need to be specifically noticed prior to such a finding, and which need not be.  His suggestion that his notice of hearing should have provided specific notice of the drug materiality and treatment noncompliance issues cannot, then, be fairly described as anything other than a suggestion that the notice of hearing be required to provide specific notice of each of the findings permissible under the Act.  The inexorable result of such a proposition would be to require, within each notice of hearing, little less than a complete reiteration of the Act.

41

This cannot be.  Molloy had actual notice of the facts underlying the drug materiality and treatment noncompliance issues—that is, his own personal medical history.  In this case, the Act itself provides sufficient notice about the specific SSI or DIB issues that may arise during a hearing or in a decision.  See, e.g., U.S. v. Campbell, 118 F. App'x 659, 664 (3d Cir. 2004) (holding that no specific notice required for district court's sentencing enhancement given Sentencing Guidelines and defendant's actual knowledge of facts underlying enhancement); Littlefield v. Heckler, 824 F.2d 242, 246 (3d Cir. 1987) (holding that, where regulations were patently clear, and therefore gave claimant constructive notice that Appeals Council, not an ALJ, would make determinations following a remand from district court, the Appeals Council did not have to provide notice that it would be reviewing the claimant's case).

Because Molloy's statutory argument and constitutional due process argument regarding drug materiality and treatment noncompliance fail, remand is unnecessary on these bases.

**B.**     **Disability Benefits Claim**

Molloy seeks a new hearing on his DIB claim on the basis of four grounds, three of which are constitutional.  (Pl.'s Br. 10-18.)  First, he argues that his due process rights were violated because the notice of hearing did not identify res judicata as a disputed issue.  Second, he argues that his mental illness prevented him from understanding the applicability of res judicata and the appellate process, as described in his 2004 notice of denial of his DIB claim.  He alleges that because he was unable to understand his appellate rights, the application of res judicata when he filed a new DIB claim in 2005 was a violation of his due process rights.  Third, he argues that ALJ O'Leary's application of res judicata was erroneous because Molloy furnished new & material evidence.  Lastly, Molloy argues that ALJ O'Leary erred by failing to make a decision

42

on Molloy's request, at the hearing, to reopen the original DIB claim filed in 2004.

With respect to his first three arguments, this Court finds that Molloy's constitutional rights were not violated. Moreover, Molloy is in a unique situation here. In the context of his SSI application, he had a full hearing on the same facts and within the same regulatory framework as he would have had if he were to have a new hearing on his DIB claim.[28] While DIB claims have one additional requirement, that disability occur before the expiration of the claimant's disability insurance, that issue is moot here. Molloy was insured until June 30, 2003, and ALJ O'Leary's conclusion of disability eligibility precedes that date. In light of the record and ALJ O'Leary's decision, any alleged DIB constitutional errors are harmless and do not require remand.

This Court agrees with Molloy's last argument, namely, that ALJ O'Leary failed to rule on his request to reopen his 2004 DIB claim. The request is remanded to the ALJ to make a decision on Molloy's request.

**1. Notice of Hearing**

    **a. Due Process**

Molloy argues that the notice of hearing failed to provide constitutionally valid notice that res judicata was a disputed issue. (Pl.'s Br. 11.) He argues that the notice said his DIB disability claim was pending, to be decided at the hearing, and that ALJ O'Leary also never stated that res judicata was an issue until he issued his final decision. (Pl.'s Br. 11-12.) This Court disagrees,

---

[28] In fact, if not for the single paragraph that asserts res judicata on the first page of ALJ O'Leary's decision, the opinion would read the same as one on the merits of a DIB claim, down to the very last page, titled, "Decision," which states, "[b]ased on the application for a period of disability and disability insurance benefits protectively filed on November 29, 2005, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act." (Tr. 17-38.)

and finds that the notice of hearing sent to Molloy was constitutionally valid, and further that

Molloy's due process rights were not violated because he had actual notice of the issue of res

judicata.

As noted above, Molloy is entitled to procedural due process during his SSI proceedings.

Torres, 125 F.3d at 169.  Due process requires that a claimant be given an opportunity to be

heard at a meaningful time and in a meaningful manner.  Goldberg, 397 U.S. at 267.

The underlying purpose of adequate and timely notice is to provide its recipient with an

opportunity to present his or her case.  See, e.g., Landon, 459 U.S. at 39.  Here, the notice did just

that: it stated, in relevant part, "[t]he hearing concerns your application of December 2, 2005, for

a period of disability and Disability Insurance Benefits under sections 216(I) and 223(a) of the

Social Security Act."[29]  (Tr. 122.)  Molloy does not present, nor does this Court find, any

precedent that requires greater specificity in this instance.

Molloy's due process claim also fails because he had actual and constructive notice of the

issue of res judicata.  There is no factual basis to support the notion that he was not given

procedural due process through proper notice.  Molloy had notice of res judicata through the

initial denial of his 2005 DIB claim, which explicitly stated that the claim was denied because it

"concerns the same issues which were decided when an earlier claim was denied."  (Tr. 104.)

Although Molloy was not represented at the time that he received this initial denial, the denial

was a part of the record at the time of the hearing.  ALJ O'Leary offered his counsel an

opportunity to review the exhibits and his counsel stated he had done so and had no objections.

_____

[29]  Molloy deceivingly describes the notice as stating that his "Title II disability claim was
pending to be decided at the hearing."  (Pl.'s Br. at 12.)  Clearly, the notice does not state that the
claim was "pending," and this Court does not need to reach the issue of whether such a statement
would have violated Molloy's due process rights.

44

(Tr. 42.)  Indeed, counsel explained the procedural history, including the prior applications, and requested to reopen the prior DIB claim.  (Tr. 44-46.)

This belies Molloy's argument that his counsel lacked notice.  The request to reopen the prior claim was only necessary, or even relevant, because it had been given res judicata effect on his 2005 DIB claim.  (See Pl.'s Br. at 12 ("The first notice counsel received that res judicata was an issue was on receipt of ALJ O'Leary's unfavorable written decision."); see also, e.g., Cooper v. Brown, 655 F. Supp. 104, 106 n.4 (E.D. Pa. 1986) (finding plaintiff was on constructive notice of failure to timely appeal because the issue had been addressed and argued by the parties in prior to the hearing, therefore plaintiff's argument that notice of hearing was insufficient because it did not raise issue of timeliness was meritless, and, furthermore, any insufficiency did not affect her ability to present her case).

Unfortunately, the cases on which Molloy relies are easily distinguished and do nothing to revive his failed argument.  In Broome, a claimant, who was unrepresented at the time of her hearing, argued that she was denied meaningful notice and opportunity on the issue of reopening, and that she should have been permitted to review the file to brief the issue of "new and material" evidence.  Broome v. Heckler, 562 F. Supp. 868, 869-70 (W.D.N.C. 1983).  Molloy, however, had counsel at the hearing and was afforded an opportunity to review the record.

In Harris, an unrepresented claimant alleged that he had no notification about the applicability of res judicata and that he had "no documentation of a prior decision."  Harris v. Callahan, 11 F. Supp. 2d 880, 882-85 (E.D. Tx. 1998).  In contrast, Molloy's initial denial on the 2005 DIB claim explicitly cited to res judicata grounds. (Tr. 104.)  This gave him notice of res judicata.  He also has documentation of the "prior decision"—his 2004 DIB claim—and the

45

denial he received explicitly stated that a failure to appeal could result in res judicata.  (Tr. 82, 97

(stating that if "you file a new application instead of appealing: . . . we could deny the new

application using this decision, if the facts and issues are the same").)

In Kapp, the final case upon which Molloy relies, the due process violation hinged on the

fact that the plaintiff there had alleged a mental impairment which precluded him from

meaningful opportunity to be heard because he could not understand his appeal rights.  Kapp v.

Schweiker, 556 F. Supp. 16, 20 (N.D. Cal. 1981).  This case is simply unrelated to this argument.

Although a mental impairment could create a due process concern, this is not what Molloy argues

here.  Molloy's argument here is that his notice of hearing was unconstitutional for failing to

raise res judicata, not, as in Kapp, that as a result of a mental impairment, he was unable to

understand his right to appeal and was thereby not afforded due process.

As this Court finds the notice of hearing was constitutionally sufficient to satisfy

Molloy's due process rights, remand is denied on this ground.

### b.  Internal Agency Requirements

Molloy also argues that Defendant failed to follow his "own rule [that] is designed to

satisfy this due process requirement."  (Pl.'s Br. at 12.)  The Act provides that a notice of hearing

"will contain a statement of the specific issues to be decided . . . ."  20 C.F.R. § 404.938(b).

An argument that Defendant failed to follow its own agency's procedures requires a

showing of prejudice resulting to Plaintiff.  See Biswas v. Comm'r of Social Sec., No. 05-3828,

2007 WL 580523 *1 (3d Cir. Feb. 26, 2007) (finding remand not required because no prejudice

resulted from agency's failure to follow its rules to provide a hearing unless given a written

waiver) (citing Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. 1981) ("As a general rule, where

46

the rights of individuals are affected, an agency must follow its own procedure, even where the internal procedures are more rigorous than otherwise would be required. . . . Should an agency in its proceedings violate its rules and prejudice result, the proceedings are tainted and any actions resulting from the proceedings cannot stand.")

Assuming, *arguendo*, that the Act requires in the notice of hearing a level of specificity that Molloy urges, Molloy's argument fails because Molloy has shown no prejudice that resulted from the notice not having identified res judicata as an issue.  Molloy does not even suggest, nor is it evident to this Court, what he would have done substantively different if res judicata had been specifically noticed.

In both the 2004 and 2005 DIB claim denials, the Commissioner stated that Molloy had not presented evidence that his health had changed prior to the expiration of his insurance.  (Tr. 82-84, 97-99, 104.)  At the hearing, Molloy and his counsel had, and took, the opportunity to present evidence regarding Molloy's disability prior to the expiration of his insurance.  Such a presentation, regarding "new and material evidence," is the primary argument that a party could make to overcome the application of res judicata.

Additionally, here, as in the due process argument, the fact that Molloy's counsel requested a reopening of his prior claim presents a logical hurdle which Molloy has not overcome.  The reopen request suggests that Molloy and his counsel were aware of the fact that res judicata had barred the 2005 DIB claim.  The request to reopen is another approach that Molloy and his counsel took to overcome the effects of res judicata.

Lastly, Molloy has received a full and fair hearing, the adequacy of which he does not contest, on his SSI claim.  Because the analytical framework and factual basis for SSI claims and

47

DIB claims are essentially identical in this case, and substantial evidence supports the Commissioner's decision to deny SSI benefits, it is difficult to see how lack of res judicata notice prejudiced Molloy.

In other words, Molloy does not suggest, nor does this Court see, how the agency's failure to identify res judicata on its notice of hearing prejudiced him.  Accordingly, Molloy's claim that Defendant failed to follow agency rules is without remedy.

### 2.  Notice of Denial

Molloy argues that the notice of denials of his 2004 DIB claims were inadequate because his mental illness prevented him from understanding his appeal rights.  (Pl.'s Br. 13-15.)  This is a claim that has been frequently asserted by those seeking benefits under the Act.  To ensure that an unrepresented claimant's due process rights are not violated as a result of the very impairment for which he seeks benefits, courts have been willing to show flexibility on the application of res judicata in these cases.  The remedy for such a situation has frequently been to allow the Commissioner to make an initial determination of whether a mental impairment precluded the claimant from understanding his appellate rights.[30]

---

[30]  There appears to be only one time that the Third Circuit Court of Appeals has found a due process violation in a motion to reopen.  In Penner, the claimant had several mental deficiencies, and, with the aid of counsel, filed for reconsideration of his claim, after, like Molloy, her initial pro se application was denied.  Penner v. Schweiker, 701 F.2d 256 (3d Cir. 1983).  The Secretary of Health and Human Services, in violation of internal procedure, and in spite of counsel's request to the contrary, sent the denial of reconsideration only to the claimant, rather than to both claimant and his counsel.  The Secretary then later dismissed his request for a hearing as untimely.  Id. at 256.  The Third Circuit remanded "with instructions that the district court direct the Secretary to make a determination, after considering such evidence as may be presented, whether mental incapacity prevented Mr. Penner from understanding and pursuing his administrative remedies."  Id. at 261.  The Court of Appeals stated that the district court would then "have a sufficient record upon which to decide what relief, if any, is consonant with due process."  Id.

Other Circuits have similarly found that the agency is best suited to make an "initial

In Molloy's case, it is unnecessary to remand for a determination on this issue.  Prior to this appeal, neither Molloy nor his counsel have presented any argument about mental impairments having precluded Molloy's appeal, even after making a request to reopen the prior claim.  Remanding on this issue would create redundancy.   Even if Molloy's due process rights were found to have been violated as a result of an alleged mental impairment, and he were afforded a hearing on his DIB claim, the outcome of his case would not change because substantial evidence supports ALJ O'Leary's decision to deny benefits under the substantively identical SSI application.

### 3.  Res Judicata

Molloy argues that ALJ O'Leary's application of res judicata was improper.  This Court disagrees, but notes that the Commissioner's application of res judicata does not clearly evince a proper review of the issue.

The application of administrative res judicata is appropriate only where the material facts alleged are the same between the initial and successive claim.  20 C.F.R. § 404.957(c)(1) (an administrative law judge may dismiss a claim without a hearing where "[t]he doctrine of res judicata applies in that we have made a previous determination . . .on the same facts"); see also Purter v. Heckler, 771 F.2d 682, 690 (3d Cir. 1985) (finding district court failed to properly inquire whether claimant's successive claim, which included new and material evidence, was barred by res judicata).  This means res judicata is not appropriate when there is new and material

determination" of whether a "mental impairment precluded the claimant from understanding the administrative notice of the claimant's procedural rights," especially since this determination is so closely related to the claim for benefits.  See Stieberger v. Apfel, 134 F.3d 37, 41 (2d Cir. 1997) (reviewing circuit precedents for procedure and degree of review a district court should afford a disability claimant who adequately alleges constitutionally defective notice).

evidence on a claim.  For evidence to be deemed material, "there must be a 'reasonable probability that the new evidence would have changed the outcome of the Commissioner's decision."  <u>Beety-Monticelli v. Comm'r of Social Sec.</u>, No. 09-1224, slip op., 2009 WL 2700170 *3 (3d Cir. Aug. 28, 2009) (quoting <u>Szubak v. Sec'y of Health and Human Servs.</u>, 745 F.2d 831, 833 (3d Cir. 1984)).

Molloy's 2004 DIB claim was rejected, at the initial and reconsideration level, because Molloy failed to provide any evidence of health changes prior to the date of the expiration of his health insurance on June 30, 2003.  (Tr. 82-84, 97-99.)  His 2005 DIB application was then denied at the initial level, based on res judicata.  In that initial denial, the Commissioner stated, "[t]he information you gave us does not show that there was any change in your health before June 2003."  (Tr. 104.)  Prior to his hearing before ALJ O'Leary, Molloy then submitted new evidence, some of which consisted of progress notes from Dr. Boyajian in 2000.  (Tr. 133-34 (letter submitting new evidence in November 2006), 465-71 (progress notes).)

In light of the fact that the prior claim was denied on the lack of evidence indicating health changes before June 2003, Molloy's later submission of Dr. Boyajian's progress notes from 2000 may have been material.[31]  The Commissioner claims that Molloy did not demonstrate at the hearing why this evidence is material, but Molloy's argument for materiality is self-evident.  The evidence consisted of Dr. Boyajian's records of Molloy's anxiety, depression, and inability to work due to stress.  (<u>Id.</u>)

It is possible to ascertain, from ALJ O'Leary's decision to deny Molloy's SSI claim, the

---

[31]  Molloy also relies on his testimony from the hearing as new and material evidence. (Pl.'s Br. 17.)  However, because subjective complaints cannot alone sustain a finding of disability, and because there is nothing particularly new in Molloy's testimony that is not already in the record, this additional evidence is less convincing as an argument against res judicata.

reasons why ALJ O'Leary applied res judicata.  In particular, although new material was presented, the evidence consisted primarily of Dr. Boyajian's notes, which ALJ O'Leary had determined carry little weight.  But the claimant should not be left to speculate why his hearing was dismissed in spite of new, and arguably material, evidence.  The Commissioner should have made a finding about the applicability of res judicata in this case *before* dismissing the hearing request for res judicata, rather than in his brief opposing Molloy's appeal.  (Def.'s Br. 11-12 (arguing evidence was not material because, inter alia, Boyajian's notes said Molloy was able to return to work, lack of contemporaneous objective evidence, and Molloy's failure to seek treatment).)

Nonetheless, it is readily apparent that the new evidence submitted is not material.  The progress notes from 2000, like the rest of Dr. Boyajian's reports, are conclusory, do not consistently indicate any mental or physical maladies, and are not supported by objective evidence.  The progress notes are also isolated in time from the remainder of the record.  Res judicata was properly applied to Molloy's 2005 DIB claim because there was no new and material evidence since the claim was first denied.

### 4.  Reopening 2004 DIB Claim

Molloy's argues that ALJ O'Leary failed to consider Molloy's request to reopen his prior claim.  This Court finds that the Commissioner erred in failing to rule on Molloy's request at the hearing to reopen the 2004 DIB claim.  See HALLEX I-2-9-1 (noting an ALJ must include a finding on the reopening and revision issue and his supporting rationale).  A claim may be reopened, within four years of the initial denial, if the Commissioner finds "good cause."  20 C.F.R. § 404.988.

The Act states that "good cause" will be found, <u>inter alia</u>, if there is "new and material evidence furnished."  20 C.F.R. § 404.989(a)(1).[32]  In his decision, the Commissioner simply failed to acknowledge Molloy's request to reopen.  Nowhere, after the initial reopen request, is the request addressed; the first and only reference to the prior 2004 DIB claim is in the decision dismissing the request for a hearing on the 2005 DIB claim.

The request to reopen is hereby remanded to the ALJ with instructions to make a discretionary decision based on the relevant statutory provisions.[33]

## V. CONCLUSION

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence and that Molloy's due process rights have not been violated. Therefore, this Court affirms the Commissioner's decision and remands Plaintiff's request to reopen his 2004 DIB claim for a ruling on that issue.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated: February 1, 2010

---

[32]  The other bases for "good cause" are: "(2) A clerical error in the computation or recomputation of benefits was made; [or] (3) The evidence that was considered in making the determination or decision clearly shows on its face that an error was made."  20 C.F.R. § 404.989(a).  The Act states that no good cause exists "if the only reason for reopening is a change of legal interpretation or administrative ruling upon which the determination or decision was made."  20 C.F.R. § 404.989(b).

[33]  A decision rendered either granting or denying reopen request does not fall within this Court's jurisdiction for review except in "one of those rare instances" where a denial is challenged by raising a colorable constitutional claim.  <u>Sanders</u>, 430 U.S. at 107-08.